17 June 1999

NO. 4-98-1014

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

CENTER FOR SIGHT OF CENTRAL ) Ap­peal from

ILLINOIS I, S.C., an Illinois ) Circuit Court of

Medical Corpora­tion, ) Macon County

      Plaintiff-Appellant, ) No. 98L61

     v. ) 

MARCUS DERANIAN, ) Honorable

      Defendant-Appellee. ) James A. Hendrian,

) Judge Presid­ing.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In April 1998 plaintiff, Center for Sight of Central Illinois I, S.C. (Center I), formerly known as Center for Sight of Central Illinois, S.C. (Center), sued to pre­vent de­fen­dant, Marcus Deranian, an oph­thal­mol­o­gist and for­mer em­ploy­ee, from violating the cove­nant-not-to-compete clause of the parties' employment contract.  In September 1998, the cir­cuit court de­nied Center I's request for a preliminary injunction, find­ing suffi­

cient evidence that Cen­ter had mate­rial­ly breach­ed the employment con­tract and there­fore failed to dem­on­strate a like­li­hood of suc­

cess on the mer­its.  In this in­ter­locu­tory ap­peal, Center I claims the trial court abused its dis­cre­tion be­cause no breach suffi­cient to ex­cuse Deranian's perfor­mance oc­curred.  We affirm.

BACKGROUND

In the early 1990s, Dr. Phillip Alward main­tained a solo ophthalmology prac­tice under the cor­po­rate name Phil­lip D. Alward, M.D., S.C.  In October 1992, Deranian began working for Alward as a 
locum
 
tenens
 and eventually joined the Alward Eye Clin­ic and Laser Surgery Center as an employee.

In July 1994, Alward sold the assets of his practice to  Equivision, Inc. (Equivision).  The sale was in­tend­ed to free Alward of the mana­gerial and adminis­trative duties of run­ning a practice so that he could focus his time and energy on patient care.  The material assets and real estate nec­es­sary to the prac­

tice would henceforth be rent­ed from Equivision and Equivision provided management services to the practice for a fee.  

The transaction included the formation of Center, which was incor­po­rated in June 1994.  Alward was ini­tially list­ed as the sole share­hold­er of Center stock, but, in Au­gust 1994, own­er­

ship of the corpo­ration was trans­ferred to Dr. Douglas Colkitt for $1.  Colkitt, a radia­tion oncolo­gist in Penn­sylva­nia, owned Equivision stock when he became president and sole shareholder of Center.  Alward testified he did not know Colkitt personally, and Colkitt played no role in the management of Center or Alward's prac­tice.  Also inci­dent to the sale of his prac­tice, Alward en­

tered an em­ploy­ment agree­ment with Center and was desig­nated "Med­ical Di­rec­tor" of Center.  Alward negoti­ated his con­tract with Lar­ry Pearson, pres­ident of Equivision.

Deranian also began negotiations with Larry Pearson in July 1994.  In Octo­ber 1994, they reached an agreement and Deranian signed the em­ploy­ment agree­ment at issue in this case.  The con­tract identi­fies the ­par­ties to the agreement as Deranian and Center.  Colkitt signed it as presi­dent.  Deranian partici­

pat­ed in the 401(k) and other employ­ee benefit plans of Equivision.  The agree­ment con­tains a re­stric­tive cove­nant pro­

hibit­ing Deranian from compet­ing with Center for a peri­od of 2 years with­in a 30-mile radi­us of Center offic­es in Decatur, Mattoon, Pana, Shelbyville, and Sullivan and within a 20-mile radius of the Taylorville office.  Throughout negotiations, Deranian had legal coun­sel.

In February 1996, Equivision merged with EquiMed, and EquiMed became the management company for Center.  In Octo­ber or No­vember 1996, EquiMed was purchased by Physicians Re­source Group (PRG).  At about the same time, Center's ownership was trans

ferred to Bruce Goldstick, M.D.  Goldstick was an ophthalmologist prac­ticing in the greater Chicago area.  When he became president of Center, Goldstick had no knowl­edge of Center or Alward's prac­

tice in Decatur.  Goldstick tes­ti­fied, by depo­si­tion, that he as­

sumed the posi­tion of pres­i­dent as a favor to agents of PRG, with whom he had a professional relationship.  According to his depos­

ition, PRG's representative told him: 

"'We're having problems now with the practice downstate.  We need your help to take over the presidency.  And don't worry, you won't have any legal responsi­bilities and you won't have any management responsibilities.  We just need a physician to be the owner.'" 

Goldstick also referred to his position as that of a "fig­ure­head" pres­i­dent.  Goldstick paid noth­ing for the shares of Center stock trans­ferred to him and re­ceived no com­pensation for serving as the company's presi­dent.   

In February 1997, Alward filed a lawsuit against EquiMed, Center, PRG, and PRG Georgia, Inc. (Macon County case No. 97-Ch-28).  In count II of his com­plaint, Alward alleged the de­fen­dant compa­nies breached his em­ployment agreement in the fol­

lowing ways:

"a.  The medical and non-medical staff has been reduced to numbers insufficient to han­dle the caseload;

b.  Suppliers of materials have not been paid in a timely fashion and are refusing to sup­ply the corporation;

c.  The corporation refused to buy equipment needed for the performance of the doctor's duties under this Agreement;

d.  The assets of CENTER were sold with­

out the consent of Phillip D. Alward, M.D.S.C."

The complaint alleged that such breaches hindered Alward's abil­i­

ty to pro­vide pa­tient care.  Alward sought damages and to be released from the restrictive cove­nant of his employment agree­

ment.  Alward testified he instigated the lawsuit, on advice of counsel, to "get PRG's attention."  Resolution of the lawsuit is not clear from the record, but by Janu­ary 1998, Alward was nego­

ti­a­ting with PRG to buy back his prac­tice and termi­nate the man­

age­ment agree­ment. 

The record indicates that Deranian's relationship with PRG was also under strain.  In June 1997, Deranian wrote to Dawn Cavanaugh, re­gion­al manag­er at PRG, ex­pressing dissat­isfaction over working ex­ten­sive hours without adequate compen­sa­tion.  To his letter, Deranian at­tached a copy of a legal opin­ion authored by the chief counsel to the Inspector General of the United States De­part­ment of Health and Human Services ad­vis­ing that the ar­range­ment be­tween PRG and the oph­thal­mol­o­gy prac­tice vio­la­ted the federal anti-kick­back stat­ute, section 1320a-7b (formerly section 1128B(b)) of the So­cial Secu­rity Act.  42 U.S.C. §1320a-

7b (1994).  In the letter to Cavanaugh, Deranian im­plied that per the legal opin­ion, his con­tract, as­signed to PRG, has no "legit­

imate le­gal stand­ing."  He threat­ened to re­sign and con­tinue to prac­tice in the Decatur area.  

In Au­gust 1997, the Center ad­min­is­tra­tor, Donna Black

well, is­sued a memo­ran­dum that lim­ited Deranian's ac­cess to pa­

tient files.  During "nor­mal busi­ness hours," staff had to see either the manager of the file room or Blackwell to obtain a file.  After hours, the files were kept "un­der lock and key," and only Alward or Blackwell had ac­cess to them.  In her depo­si­tion, Blackwell tes­ti­fied that she im­ple­ment­ed this policy on the di­

rec­tion of Cavanaugh.

On January 15, 1998, Deranian did not receive his pay­

check as scheduled.  Neither Alward or Donna Blackwell knew who owned Center or who Deranian should query about his pay­check.  Deranian con­tacted Goldstick, who told him to contact PRG.  When Deranian contacted PRG, he was re­ferred back to Alward.  Deranian re­signed on January 26, 1998, cit­ing repeated material breaches of his employment agree­ment and nonpay­ment.  Deranian re­ceived his pay­check on Janu­ary 31, 1998.  

In the effort to track down his paycheck, Deranian learned that Center had been in­vol­un­tari­ly dis­solved for nonpay­

ment of corporate fran­chise taxes.  In early February 1998, Deranian in­cor­po­rated under that name, 
i.e.
, "Center for Sight of Central Illi­nois, S.C."  Deranian tes­ti­fied that he an­tici­pated opening a prac­tice in the future and thought the Center name rec­

og­ni­tion would be bene­ficial.  The origi­nal Center was rein­stated in late Feb­ru­ary but was required to change its cor­po­rate name, thus Cen­ter I came into ex­istence.

After Deranian left Center, he worked as an independent con­tractor for an ophthalmologist in Centralia, Illi­nois.  His duties included practice at satellite locations in Decatur and Shelbyville.  In May 1998, Deranian opened his own prac­tice in Decatur.  Al­though his corpo­rate name is "Cen­ter for Sight of Central Illi­nois, S.C.," Deranian does busi­ness as the Cen­tral Illi­nois Vi­sion Cen­ter.

In March 1998, ownership of Center I was transferred to Alward.  In April 1998, Center I filed its motion for a prelimi­nary injunction against Deranian to enforce the restrictive cove­

nant in his employment agreement.  A hearing was held, the par­

ties sub­mit­ted argu­ments in writ­ing, and they stip­u­lat­ed to the court's consid­er­ation of discov­ery deposi­tions as sub­stan­tive evidence.  Deranian raised several affirma­tive defenses, which he also argues on ap­peal.  First, he contends Center's mate­rial breach­es of the con­tract relieve him of the duty to honor the restric­tive cove­nant.  The alleged breaches include the follow­

ing: (1) fail­ure to pay his scheduled draw, (2) reduction of Alward's hours (which re­duced Deranian's income, which was based on net in­come of the prac­tice), (3) re­duction in Alward's "on-

call" as­sign­ments, (4) fail­ure to pro­vide ade­quate staffing and equipment such that Deranian's ability to generate fees was im­

paired, and (5) assign­ment of the con­tract.  Deranian also con­

tends the con­tract is unenforceable because (1) the com­pen­sa­tion scheme allowed for illegal fee-split­ting between physicians and nonphysicians; (2) the man­age­ment com­pa­nies un­law­fully engaged in the cor­po­rate prac­tice of medi­cine; and (3) his em­ployment con­

tract was as­signed in vio­la­tion of pub­lic poli­cy.

The trial court found Center I made a sufficient show­

ing of the ele­ments neces­sary for an in­junc­tion 
ex­cept
 a likeli­

hood of suc­cess on the mer­its.  Specifically, the court found:

"[T]he defendant has presented sufficient evi­dence indicating that the plaintiff will not prevail on the merits of the case due to substantial and material violations of the employment agreement.  That the violations include but are not limited to[:] assignment of the contract, inadequate staffing[,] and re­duced hours of work by Dr. Alward[,] each re­sulting in the diminishment of revenues be­

yond normal and expected fluctuations in gross revenues."

Thus, the motion for a preliminary injunction was denied.  This ap­peal fol­lowed.

ANALYSIS

Center I appeals pursuant to Supreme Court Rule 307(a)(1) (166 Ill. 2d R. 307(a)(1)).  Therefore, the only ques­

tion be­fore us is whether a suffi­cient show­ing was made to the trial court to sustain the order denying the relief sought.  
Postma v. Jack Brown Buick, Inc.
, 157 Ill. 2d 391, 399, 626 N.E.2d 199, 203 (1993).  An appeal under this rule may not be used "as a vehicle to determine the merits of a plaintiff's case."  
Postma
, 157 Ill. 2d at 399, 626 N.E.2d at 203.  Trial courts have sub­stan­tial discretion in deciding wheth­er to grant a tempo­rary injunc­tion (
Danville Poly­clinic, Ltd. v. Dethmers
, 260 Ill. App. 3d 108, 109, 631 N.E.2d 842, 843 (1994)), and the deci­

sion of the trial court will not be dis­turbed on ap­peal absent an abuse of dis­cre­tion (
Weitekamp v. Lane
, 250 Ill. App. 3d 1017, 1022, 620 N.E.2d 454, 458 (1993)).  The findings of the trial court will not be dis­turbed un­less they are contrary to the mani­

fest weight of the evi­dence.  
Decker, Berta & Co. v. Berta
, 225 Ill. App. 3d 24, 27-28, 587 N.E.2d 72, 74 (1992).

As a general rule, a preliminary injunction requires a showing by a preponderance of the evidence (
Weitekamp
, 250 Ill. App. 3d at 1022, 620 N.E.2d at 458) that the plain­tiff (1) has a clear­ly as­cer­tain­able right that needs pro­tec­tion, (2) will suf­

fer ir­rep­a­ra­ble harm with­out the pro­tec­tion, (3) has no ade­quate remedy at law, and (4) is likely to succeed on the mer­its (
Postma
, 157 Ill. 2d at 399, 626 N.E.2d at 204).  This court has also con­sid­ered wheth­er the bene­fits of grant­ing the pre­lim­i­nary in­junc­tion will ex­ceed the inju­ry to the defen­dant.  
Danville
, 260 Ill. App. 3d at 111, 631 N.E.2d at 844; 
Sarah Bush Lincoln Health Center v. Perket
, 238 Ill. App. 3d 958, 961, 605 N.E.2d 613, 616 (1992).  A plain­tiff need only provide 
prima
 
facie
 evi­

dence of the requi­site ele­ments to obtain in­junc­tive relief.  
Weitekamp
, 250 Ill. App. 3d at 1022, 620 N.E.2d at 458. 

Because Illinois courts ab­hor restraints on trade, restrictive covenants are carefully scruti­nized.  
Gillespie v. Carbondale & Marion Eye Centers, Ltd.
, 251 Ill. App. 3d 625, 626, 622 N.E.2d 1267, 1269 (1993).  Though general­ly restraints of trade are held void, where the limitation as to time and territo­

ry is not unreason­able, a restrictive covenant is valid and en­

force­able and re­lief by in­junction is customary and proper.  
Canfield v. Spear
, 44 Ill. 2d 49, 50-51, 254 N.E.2d 433, 434 (1969).  In de­ter­mining whether to grant an injunction enforcing a restric­tive covenant, courts look to whether the covenant is reasonable (
Weitekamp
, 250 Ill. App. 3d at 1023, 620 N.E.2d at 459) and valid (
Retina Ser­vices, Ltd. v. Garoon
, 182 Ill. App. 3d 851, 855, 538 N.E.2d 651, 652 (1989)).

The trial court's conclusion that Center I failed to show a like­li­hood of success on the merits is not against the manifest weight of the evidence.  Overturning a trial court's judgment under the mani­fest weight of the evi­dence standard re­

quires our finding the oppo­site re­sult is apparent or the find­

ings appear to be unreasonable, arbitrary, or not based on evi­

dence.  
Bazydlo v. Volant
, 164 Ill. 2d 207, 215, 647 N.E.2d 273, 277 (1995).  Given the com­plex­ity of this case, and the strength of Deranian's nu­merous defens­es, the oppo­site re­sult is not clear­ly evi­dent.  

Center I had the burden to show a likeli­hood of success on the merits by a preponderance of the evidence.  
Weitekamp
, 250 Ill. App. 3d at 1022, 620 N.E.2d at 458.  The trial court consid­

ered the testi­mony presented at the hearing, deposition testimony and exhibits.  Many of the facts underlying Deranian's breach of contract de­fense are undis­puted.  Deranian's breach of contract defense is further bol­stered by Alward's breach of contract ac­

tion against Cen­ter, which con­tains some of the same factual assertions.  For example, Alward's com­plaint asserts that staff re­duc­tions and PRG's failure to ob­tain equip­ment hin­dered his abil­ity to prac­tice.  The trial court was entitled to cred­it the un­dis­puted tes­ti­mony indi­cat­ing mate­rial breaches had oc­curred and was there­fore enti­tled to find that suc­cess on the mer­its could not be pre­dict­ed.    

While analysis of Deranian's alternative defense theo­

ries is not es­sen­tial to our holding, the re­cord sug­gests this con­tract was formed in vio­la­tion of section 13 of the Medi­cal Cor­po­ra­tion Act (Act) (805 ILCS 15/13 (West 1996)).  See 
People ex rel. Nel­son v. Wiersema State Bank
, 361 Ill. 75, 94, 197 N.E. 537, 545 (1935).  Section 13 of the Act pro­vides:

"All of the officers, directors[,] and share­holders of a corpora­tion subject to this Act shall at all times be persons licensed pursu­ant to the Medical Practice Act of 1987.  No person who is not so licensed shall have any part in the ownership, management, or control of such corporation, nor may any proxy to vote any shares of such corporation be given to a person who is not so licensed."  805 ILCS 15/13 (West 1996).

In 
Frydman v. Horn Eye Cen­ter, Ltd.
, 286 Ill. App. 3d 853, 676 N.E.2d 1355 (1997), the first district affirmed the circuit court's dismissal of the plaintiff's breach of contract claim be­

cause the con­tract called for conduct in violation of the Act.  The plain­tiff in 
Frydman
 was not a phy­si­cian, but had en­tered a let­ter agree­ment with a medi­cal cor­pora­tion that pro­vid­ed he would be­come its presi­dent.  The agree­ment also provided that plaintiff would be com­pen­sated in cash and an equi­ty posi­tion in the com­pa­ny.  
Frydman
, 286 Ill. App. 3d at 855, 676 N.E.2d at 1357.  The review­ing court held that since the contract called for a nonphysi­cian to be presi­dent of a medical corpora­tion and to take part in the man­age­ment and con­trol thereof, the con­tract was ille­gal and unen­forceable.  
Frydman
, 286 Ill. App. 3d at 859, 676 N.E.2d at 1360. 

The circumstances of this case differ from those in 
Frydman
.  If Deranian's contract were to be found unenforceable, it would not be be­cause performance under the contract violated the statute but because the contract was executed in viola­tion of the stat­ute.  Although Colkitt, presi­dent of Center, signed Deranian's con­tract, it appears he did so at the direction of Larry Pearson, 
pres­i­dent
 
of
 
Equivision
, who drafted and negotiat­

ed the contract.  Colkitt was pres­i­dent of Cen­ter in name only and func­tioned as pres­ident under the direc­tion of Pearson and Equivision.  Colkitt did not hire Deranian, manage the corpo­ra­

tion, or manage the practice.  If by nego­ti­a­ting Deranian's em­

ploy­ment con­tract Pearson took part in the man­age­ment and con­trol of Cen­ter (a medi­cal cor­pora­tion), the contract was formed in violation of the statute.  805 ILCS 15/13 (West 1996).  The re­

cord con­tains no evi­dence that Pearson is a li­censed physi­cian, or was a li­censed physi­cian when he negoti­ated the agree­ment with Deranian.

It is not unlawful for nonphy­si­cians to nego­ti­ate em­

ployment contracts with physi­cians under all cir­cum­stances.  Hospitals, for example, are not required to com­ply with the doc­trine against the corporate prac­tice of medi­cine be­cause they are otherwise licensed and regu­lated under Illinois law.  
Ber­lin v. Sarah Bush Lincoln Health Center
, 179 Ill. 2d 1, 15, 688 N.E.2d 106, 112 (1997).  Likewise, an officer of a medi­cal corpo­ration is enti­tled to direct a nonphysician employ­ee to enter negotia­

tions with a physician.  Under the cir­cum­stanc­es of this case, however, the medi­cal cor­pora­tion was a "dummy" cor­po­ra­tion whose president was controlled by nonphysicians.  We question whether the signa­ture of a "fig­urehead president" satisfies the require­

ments of the Act since to do so seems to ele­vate a legal tech­ni­

cal­ity over the sub­stance of the law.

CONCLUSION

For the fore­go­ing rea­sons, the judg­ment of the cir­cuit court is af­firmed.  

Affirmed.

KNECHT, P.J., and COOK, J., concur.